BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTI-DISTRICT LITIGATION

| | |
|---|---|
| In re: American Medical Collection Agency Data Breach Litigation | MDL No. |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF PLAINTIFF
PAULA WORTHEY FOR TRANSFER AND CENTRALIZATION
PURSUANT TO 28 U.S.C. § 1407**

Pursuant to 28 U.S.C. § 1407 and the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Plaintiff Paula Worthey ("Plaintiff") respectfully submits this Memorandum of Law in Support of her Motion for Transfer and Centralization of all currently filed federal cases ("Actions") arising out of the Data Breach at issue, and any subsequent "tag along" cases involving similar claims, to the Southern District of New York, before the Honorable Nelson S. Roman.

## I.   INTRODUCTION

This litigation involves a common data breach announced on or around June 3, 2019 (the "Data Breach").  Plaintiffs in these related cases allege that Defendants American Medical Collection Agency, Inc. ("AMCA"), Optum360 Services, Inc. ("Optum360"), and Quest Diagnostics Incorporated ("Quest") (collectively, "Defendants") failed to protect the confidential information of millions of patients — including their financial information (e.g., credit card numbers and bank account information), medical information, personal information (e.g., Social Security Numbers), and other protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") (collectively, "Sensitive Information").

On June 3, 2019, Quest publicly admitted in a filing with the Securities and Exchange Commission ("SEC") that: "On May 14, 2019, American Medical Collection Agency ("AMCA"), a billing collections vendor, notified Quest . . . and Optum360 LLC, [Quest's] revenue cycle management provider," of the massive Data Breach compromising the Sensitive Information of 11.9 million Quest patients, and most likely others (the "Data Breach"). Quest Form 8-K, June 3, 2019. Quest's SEC filing further disclosed that, "between August 1, 2018 and March 30, 2019 an unauthorized user had access to AMCA's system that contained information that AMCA had received from various entities, including Quest Diagnostics, and information that AMCA collected itself[,] . . . include[ing] financial information (e.g., credit card numbers and bank account information), medical information[,] and other personal information (e.g., Social Security Numbers)." Although Quest knew of the Data Breach at least as of May 14, 2019, and AMCA knew of it even earlier, neither took any steps to notify patients whose information was affected until June 3, 2019, at which point Quest only did so through an SEC filing.

Each of the Actions is a putative class action, and each is filed on behalf of a virtually identical nationwide class and California sub-class. *See Worthey v. American Medical Collection Agency, Inc. et al.*, Case No. 7:19-cv-05210 (S.D.N.Y.), Complaint ¶ 29; *Gutierrez v. Am. Medical Collection Agency, Inc., et al.*, Case No. 7:19-cv-05212 (S.D.N.Y.), Complaint ¶ 29; and *Marler v. Quest Diagnostics, Inc., et al.*, Case No. 8:19-cv-01091 (C.D. Cal.), Complaint ¶¶ 64-65. As previously discussed, each action alleges a common failure to protect Plaintiffs' Sensitive Information resulting in the Data Breach announced by Quest on or around June 3, 2019.

Plaintiff is not aware of any other cases being filed on behalf of similarly situated consumers. However, based on the scope of the announced Data Breach, Plaintiff does anticipate

2

additional cases will be filed nationwide. All such Actions are in their infancy. None of the Defendants have answered the Complaint or otherwise appeared in the Actions.

Based on the numerous common questions of fact involved in the Actions, the compelling need to establish uniform and consistent standards in conducting pretrial discovery and motion practice, and because the most logical and convenient location for these proceedings is the Southern District of New York, Plaintiff respectfully requests coordinated proceedings there.

## II.  BACKGROUND

This motion for transfer involves three actions pending in two different federal Districts[1] asserting common factual allegation and involving overlapping claims, classes, and legal issues. Based on the extensive press coverage of the Data Breach, Plaintiff expects additional actions to be filed in the federal courts alleging similar claims, on behalf of similar classes.

### A.  Plaintiffs

All plaintiffs in the pending Actions have filed civil actions arising from Quest's recent disclosure of a massive breach affecting AMCA's systems that compromised the Sensitive Information of at least 11.9 million Quest patients. The Actions are pursued on behalf of all persons whose Sensitive Information was compromised in the Data Breach.

Each of these pending federal cases presents a common core of facts, in that each (i) alleges that plaintiffs' Sensitive Information was disclosed during the Data Breach; (ii) asserts injury and damages arising from Defendants' wrongful conduct; and (iii) alleges the same or similar conduct by Defendants. Indeed, the factual allegations in plaintiffs' complaints are nearly identical in numerous critical respects.

---

[1] *See* Schedule of Actions, attached, for a complete listing of the Actions.

**B.     Defendants**

Defendant AMCA is a New York corporation with its principal place of business in Elmsford, New York, in the Southern District of New York.  Defendant Quest is a Delaware corporation with its principal place of business in Secaucus, New Jersey.  Based on information and belief, Defendant Optum360 is a Delaware corporation with its principal place of business in Eden Praire, Minnesota.

**C.     Status of the Actions**

Plaintiffs filed the pending federal actions in New York and California, on the same day as Quest's announcement of the Data Breach.  Given the infancy of these cases, none of the plaintiffs have been permitted to conduct discovery, or any other actions that would move the matters along towards trial such that transfer would be unduly prejudicial or inefficient.  These Actions are in the earliest procedural stage — no defendant has answered or otherwise appeared — and, accordingly, it is a convenient time to coordinate the Actions.

**III.    ARGUMENT**

The Actions listed in the attached Schedule of Actions name AMCA, Optum360, and Quest as the only three Defendants.  There also is substantial overlap between the causes of action: Each case includes causes of action for: negligence; breach of implied contract; violation of California's Confidential Medical Information Act, Cal. Civ. Code §§ 56 *et seq.*; violation of the New York General Business Law § 349; violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; and violation of California's Customer Records Act, Cal. Civ. Code §§ 1798.81 *et seq.*  The *Marler* action includes those claims, as well as claims for breach of contract; violation of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*; unjust enrichment; and invasion of privacy claims.

The Actions all involve common issues of fact and a common Data Breach, such that centralization will promote the convenience of the parties and witnesses and the just and efficient conduct of the litigation. *See* 28 U.S.C. § 1407. Transfer and centralization will mitigate the possibility of inconsistent rulings, including rulings regarding class certification, and will promote judicial economy by providing a single forum to which future tag-along actions can be transferred. Accordingly, Plaintiff respectfully moves this Panel for transfer to the Southern District of New York, the most favorable district for centralization, before Judge Roman, a capable and experienced jurist of the highest caliber.

### A. These Actions and any Tag-Along Actions Are Appropriate for Transfer and Centralization Under 28 U.S.C. § 1407(A)

Transfer and centralization is permitted if civil actions pending in different districts "involv[e] one or more common questions of fact" and this Panel determines that transfer will further "the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). "The objective of transfer is to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts." *Manual for Complex Litigation*, § 20.131 (4th ed. 2004). Transfer and centralization for pretrial proceedings would achieve those objectives in the instant litigation, and therefore are appropriate here.

#### i. The Actions Involve Common, Numerous, and Complex Questions of Fact

The first element of the Section 1407 transfer analysis is whether there are one or more common questions of fact. *See* 28 U.S.C. § 1407. The statute, however, does not require a "complete identity or even [a] majority" of common questions of fact to justify transfer. *In re Zyprexa Prods. Liab. Litig.*, 314 F. Supp. 2d 1380, 1381 (J.P.M.L. 2004).

5

Here, there is no question that these cases share a common core of operative factual allegations.  The Actions are based upon identical facts concerning identical conduct by Defendants.  The factual questions common to the actions are numerous and complex, including:

- Whether Defendants' data security systems prior to the Data Breach met the requirements of laws including, for instance, HIPAA;

- Whether Defendants' data security systems prior to the Data Breach met industry standards;

- Whether Plaintiff's and other Class members' Sensitive Information was compromised in the Data Breach; and

- Whether Plaintiff's and other Class members are entitled to damages as a result of Defendants' conduct.

In addition, both actions rely upon similar legal theories of recovery.  These theories include: negligence; breach of implied contract; violation of California's Confidential Medical Information Act, Cal. Civ. Code §§ 56 *et seq.*; violation of the New York General Business Law § 349; violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; and violation of California's Customer Records Act, Cal. Civ. Code §§ 1798.81 *et seq.*  Thus, the lawsuits share related underlying legal theories of liability, each turning on the failure of Defendants to prevent the Data Breach.  As the Panel previously has stated, "the presence of additional or differing legal theories is not significant when the actions still arise from a common factual core . . . ."  *In re Oxycontin Antitrust Litig.*, 542 F. Supp. 2d 1359, 1360 (J.P.M.L. 2008).

Because numerous common issues of fact exist among these Actions, the pending actions clearly satisfy the first element of the transfer analysis under Section 1407.

### ii. MDL Transfer and Centralization Will Further the Convenience of the Parties and the Witnesses.

Resolution of these common issues in a single forum would further the convenience of all parties and witnesses. *See* 28 U.S.C. § 1407(a). Because all Actions involve similar allegations and factual questions, the plaintiffs in the actions will require depositions of the same persons and discovery of the same documents. Defendants likely will raise the same discovery objections and seek the same protective orders or privileges in each case. Absent centralization and transfer, all parties will be subjected to duplicative discovery and witnesses will face multiple, redundant depositions. *See, e.g.*, *In re Pilot Flying J Fuel Rebate Contract Litigation (No. 11),* 11 F. Supp. 3d 1351, 1352 (J.P.M.L. 2014) ("Centralization will avoid repetitive depositions of [the defendant's] officers and employees and duplicative document discovery regarding the alleged scheme"); *In re Uranium Indus. Antitrust Litig.*, 458 F. Supp. 1223, 1230 (J.P.M.L. 1978) ("[Plaintiffs] will have to depose many of the same witnesses, examine many of the same documents, and make many similar pretrial motions in order to prove their . . . allegations. The benefits of having a single judge supervise this pretrial activity are obvious.").

Absent transfer, the federal court system will be forced to administer — and Defendants will be compelled to defend — these related actions across multiple venues, all proceeding on potentially different pretrial schedules and subject to different judicial decision-making and local procedural requirements. Moreover, each plaintiff will be required to monitor and possibly participate in each of the other similar actions to ensure that Defendants do not provide inconsistent or misleading information. Many of the same pretrial disputes are likely to arise in each action. Likewise, due to the similar causes of action in each complaint, Defendants will likely assert the same defenses, as well as file motions to dismiss and summary judgment on the same claims based on the same arguments in each action.

None of the pending cases have progressed to the point where efficiencies will be forfeited through transfer to an MDL proceeding. This Panel has routinely recognized that consolidating litigation in one court benefits *both* plaintiffs and defendants. For example, pretrial transfer would reduce discovery delays and costs for plaintiffs, and permit plaintiffs' counsel to coordinate their efforts and share the pretrial workload. *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.,* 173 F. Supp. 2d 1377, 1379 (2001) ("And it is most logical to assume that prudent counsel will combine their forces and apportion their workload in order to streamline the efforts of the parties and witnesses, their counsel and the judiciary, thereby effectuating an overall savings of cost and a minimum of inconvenience to all concerned."); *In re Baldwin-United Corp. Litigation,* 581 F. Supp. 739, 741 (J.P.M.L. 1984) (same). As for Defendants, national or "generic" expert depositions will be coordinated, document production will be centralized, and travel for its current and former employees will be minimized, since it will only have to appear in one location rather than multiple districts around the country.

While Plaintiff anticipates there will be additional case filings, even the current level of litigation would benefit from transfer and coordinated proceedings, given the allegations of these complaints. *See In re First Nat'l Collection Bureau, Inc., Tel. Consumer Prof. Act (TCPA) Litig.*, 11 F. Supp. 3d 1353, 1354 (J.P.M.L. 2014) ("Although there are relatively few parties and actions at present, efficiencies can be gained from having these actions proceed in a single district," such as "eliminat[ing] duplicative discovery; prevent[ing] inconsistent pretrial rulings . . . and conserv[ing] the resources of the parties, their counsel and the judiciary."); *In re: Zurn Pex Plumbing Products Liability Litig.*, 572 F.Supp.2d 1380, 1381 (J.P.M.L. 2008) (granting transfer and consolidation of three cases and six potential tag-alongs because of the

"overlapping and, often, nearly identical factual allegations that will likely require duplicative discovery and motion practice).

Transfer also will reduce the burden on the parties by allowing more efficient and centralized divisions of workload among the attorneys already involved in this litigation, as well as those who join later.  Plaintiffs themselves will reap efficiencies from being able to divide up the management and conduct of the litigation as part of a unified MDL process through a plaintiffs' steering committee or similar mechanism, instead of each plaintiffs' firm separately litigating its own cases on distinct and parallel tracks.  *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 173 F. Supp. 2d at 1379; *In re Tylenol Mktg., Sales Pracs. and Prods. Liab. Litig.*, 936 F. Supp. 2d at 1379 ("Centralization will ... conserve the resources of the parties, their counsel, and the judiciary.").

In sum, transfer of these actions would serve the convenience of the parties and eliminate duplicative discovery, saving the parties-and the courts significant time, effort, and money.

**B. Transfer and centralization Will Promote the Just and Efficient Conduct of These Actions**

Centralization is necessary to prevent inconsistent pretrial rulings on many central issues, which would present significant problems due to the substantial consistency in factual and legal allegations among all Actions.  *See In re: Lumber Liquidators Chinese-Manufactured Flooring Products Mktg., Sales Practices and Products Liability Litig.*, 109 F. Supp. 3d at 1383 ("Centralization will . . . avoid inconsistent pretrial rulings (including on issues of class certification and *Daubert* motion practice) . . . .").

The prospect of inconsistent rulings also encourages forum and judge shopping (including, for example, manipulation of non-congruent discovery limits, approaches to

9

electronically stored information, and protective order issues). By contrast, a single MDL judge coordinating pretrial discovery and ruling on pretrial motions in all of these federal cases at once will help reduce witness inconvenience, the cumulative burden on the courts, and the litigation's overall expense, as well as minimizing this potential for conflicting rulings. *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 65 F. Supp. 3d 1402, 1405 (J.P.M.L. 2014) ("Issues concerning the development, manufacture, regulatory approval, labeling, and marketing of Xarelto thus are common to all actions. Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel and the judiciary."); *In re Tylenol Mktg., Sales Pracs. and Prods. Liab. Litig.*, 936 F. Supp. 2d at 1379 ("Centralization will ... prevent inconsistent pretrial rulings (on Daubert issues and other matters)....").

Centralization will mitigate these problems by enabling a single judge to manage discovery and the parties to coordinate their efforts. This will reduce litigation costs and minimize inconvenience to the parties and witnesses, to the benefit of litigants, third parties, and the courts. *See In re Enfamil Lipil Mktg. and Sales Practices Litig.*, 764 F. Supp. 2d 1356, 1357 (J.P.M.L. 2011) ("Centralizing the actions will allow for the efficient resolution of common issues and prevent unnecessary or duplicative pretrial burdens from being placed on the common parties and witnesses."); *In re: Lumber Liquidators Chinese-Manufactured Flooring Products Mktg., Sales Practices and Products Liability Litig.*, 109 F. Supp. 3d at 1383 ("Centralization will . . . conserve the resources of the parties, their counsel and the judiciary.").

Centralizing these actions under Section 1407 will ensure streamlined resolution of this litigation to the overall benefit of the parties and the judiciary. *In re Amoxicillin Patent & Antitrust Litig.*, 449 F. Supp. 601, 603 (J.P.M.L. 1978) (granting transfer and consolidation of

three cases "[b]ecause of the presence of complex factual questions and the strong likelihood that discovery concerning these questions will be both complicated and time-consuming, we rule that transfer under Section 1407 is appropriate at the present time even though only three actions are presently involved").

Accordingly, transfer to a single district court is appropriate for the just and efficient resolution of these cases.

### C. The Southern District of New York Is an Appropriate and Optimal Transferree Forum, and Judge Roman Is an Appropriate Transferee Judge

Plaintiffs respectfully submit that the Southern District of New York is the superior forum for the centralized action, and Judge Roman the ideal transferee judge. In choosing an appropriate transferee forum, this Panel considers: (1) where the largest number of cases is pending; (2) where discovery has occurred; (3) where cases have progressed furthest; (4) the site of the occurrence of the common facts; (5) where the cost and inconvenience will be minimized; and (6) the experience, skill, and caseloads of available judges. *Manual for Complex Litigation*, § 20.132 (4th ed. 2004). While several of these criteria are not yet implicated due to the infancy of the Actions, the Judge Roman, in the Southern District of New York, presents the most appropriate forum for the transfer and centralization of these actions, primarily because it has a judiciary well experienced, is where two of the three currently pending Actions were filed, and is where Defendants AMCA and Quest are headquartered.

The first factor favors the Southern District of New York, given that two of the three current actions are pending there. The second and third factors are not relevant here because discovery has not yet occurred in any case, and none of the Defendants have answered the Complaints or otherwise appeared.

11

As to the fourth factor, Defendant AMCA is a New York corporation with its principal place of business in Elmsford, New York. The Data Breach at issue occurred after an unauthorized user gained access to AMCA's system that contained information that AMCA had received from various entities. AMCA was the first of the Defendants to learn of the Data Breach and, thus, AMCA was first of the Defendants to breach its duty to disclose the Data Breach. While the relevant services are provided throughout the United States, so no one specific location is the dominant site of all common facts, the fact that the Data Breach occurred through AMCA's system argues forcefully for New York being the dominant site of the most relevant occurrence.

In addition, Defendant Quest, which first disclosed the Data Breach through an SEC filing, is headquartered in the Southern District of New York. As that filing disclosed, the Data Breach compromised some 11.9 million of Quest's patients' records.

The fifth factor favors the Southern District of New York given that AMCA and Quest are headquartered there, and that District likely is where the most important witnesses and evidence will be located.

The sixth factor favors Judge Roman, who is an experienced and capable judge, and was assigned to the earliest filed case in the Southern District of New York, the *Worthey* action. Judge Karas, who presides over the *Guttierez* action, already presides over one MDL, *IN RE: Ford Fusion and C-Max Fuel Economy Litigation*, MDL No. 2450. Otherwise, this factor is neutral as between the Central District of California and the Southern District of New York, given that both Districts have many experienced judges capable of handling a complex MDL actions such as this, both Districts regularly manage such actions, and both currently have a significant number of such actions pending.

When considered together, these factors support transfer and centralization in the Southern District of New York.

### III. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that her motion be granted and that the Panel order transfer of the Actions listed in the attached Schedule of Actions, plus any future tag-along actions, to the Southern District of New York, before Judge Nelson S. Roman, for consolidated pretrial proceedings in accordance with 28 U.S.C. § 1407.

Respectfully submitted,

Dated:  June 4, 2019  **AHDOOT & WOLFSON, PC**

/s/ Tina Wolfson
Tina Wolfson
*twolfson@ahdootwolfson.com*
Brad King
*bking@ahdootwolfson.com*
Theodore W. Maya
*tmaya@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
45 Main Street, Suite 528
Brooklyn, NY 11201
Tel: 917-336-0171
Fax: 917-336-0177

Russell Yankwitt
*russell@yankwitt.com*
Michael H. Reed
*michael@yankwitt.com*
**YANKWITT LLP**
140 Grand Street
Suite 705
White Plains, NY 10601
Tel: 914-686-1500
Fax: 914-487-5000

*Counsel for Plaintiff*

*and the Putative Classes*